UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| [UNDER SEAL], | Case No. |
| Plaintiffs, | COMPLAINT |
| v. | |
| [UNDER SEAL], | **FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |
| Defendants. | |

**DOCUMENT TO BE KEPT UNDER SEAL**

Daniel M. Twetten
dan@loevy.com
LOEVY & LOEVY
2060 Broadway, Suite 460
Boulder, CO 80302
Tel: (720) 583-6514
Colorado Bar Number: 44134

Timothy P. McCormack
tmccormack@phillipsandcohen.com
Molly B. Knobler
mknobler@phillipsandcohen.com
PHILLIPS & COHEN LLP
2000 Massachusetts Ave, NW
Washington, DC 20002
Tel: (202) 833-4567

Mary A. Inman
minman@pcsf.com
PHILLIPS & COHEN LLP
100 The Embarcadero, Suite 300
San Francisco, CA 94105
Tel: (415) 836-9000

Attorneys for [UNDER SEAL]

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| UNITED STATES OF AMERICA, <u>ex rel</u>. DR. JAMES M. TAYLOR, M.D., <br><br>            Plaintiffs, <br><br>    vs. <br><br> KAISER PERMANENTE, KAISER FOUNDATION HEALTH PLAN, INC., KAISER FOUNDATION HEALTH PLAN OF COLORADO, KAISER FOUNDATION HEALTH PLAN OF GEORGIA, and KAISER FOUNDATION HEALTH PLAN OF THE NORTHWEST, <br><br>            Defendants. | Case No. <br><br> COMPLAINT FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT [31 U.S.C. §§ 3729 et seq.] <br><br> **FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** <br><br> **JURY TRIAL DEMANDED** |

*Qui Tam* Plaintiff-Relator Dr. James M. Taylor, M.D., through his attorneys, on behalf of the United States of America (the "Government," or the "Federal Government"), for his Complaint against Defendants Kaiser Permanente, Kaiser Foundation Health Plan, Inc., Kaiser Foundation Health Plan of Colorado, Kaiser Foundation Health Plan of Georgia, and Kaiser Foundation Health Plan of the Northwest (collectively "Kaiser" or "the Kaiser Defendants") alleges, based upon personal knowledge, relevant documents, and information and belief, as follows:

## I.    INTRODUCTION

1.    This is an action to recover damages and civil penalties on behalf of the United States of America arising from false and/or fraudulent records, statements, and claims made and caused to be made by Defendants and/or their agents and employees in violation of the federal False Claims Act, 31 U.S.C. § 3729 *et seq*. This *qui tam* case is brought against Defendants for

knowingly defrauding the federal Government in connection with the Medicare program.  As alleged below, since at least 2004 to present, Kaiser has knowingly submitted and caused to be submitted to the Centers for Medicare & Medicaid Services ("CMS") false claims for enhanced "risk adjustment" payments.  Likewise, Kaiser has knowingly retained overpayments received from CMS for risk adjustment claims that Kaiser later learned, or in the exercise of reasonable care should have learned, were false.

2.      Through the MA program, CMS allows private health insurers to set up managed care plans to cover Medicare beneficiaries.  CMS pays a monthly capitation rate for each beneficiary enrolled as a member of a Medicare Advantage ("MA") plan.  MA plans must then use that money to pay hospitals, physicians, and other health care providers for the services the plan members receive and to cover the plans' administrative expenses.  Certain MA plans are also given money to pay for the plan members' prescription drugs.  Under both types of plans, CMS adjusts the capitation rate for each beneficiary to reflect that beneficiary's individual demographics (*e.g.*, age and gender), geographic location, and health status.

3.      The adjustment for each member's health status is one of the most significant components of the capitation rate.  Individuals with multiple and/or serious health conditions account for more health care costs than healthy members.  Accordingly, CMS pays a substantially higher capitation rate for members who have been recently treated for one or more serious, expensive diseases or conditions.  These increased payments are known as "risk adjustment" payments.  On average, CMS pays MA plans close to $3,000 per year for each condition a member has that requires a risk adjustment payment.

4.      To receive these risk adjustment payments, MA plans submit claims to CMS each year for each member for each qualifying disease or condition.  MA organizations may only

submit risk adjustment claims if the individual patient has been diagnosed with the condition in question, consistent with established coding standards, and there is documentation in the patient's medical record that: (1) the diagnosis was treated or affected treatment; (2) in a face-to-face visit (except for pathology services performed by a pathologist); (3) with an appropriate provider type; and (4) during the proper time period.

5.      Since at least 2004 to present, the Kaiser Defendants have perpetrated a systematic fraud on the Medicare Advantage program.  They routinely submit false claims to CMS when they know, or in the exercise of reasonable care should know, that: (1) the patients do not have the diagnoses for which a risk adjustment claim was submitted; and/or (2) the diagnosis: a) was neither treated nor affected the treatment provided; b) in a face-to-face visit; c) with an appropriate provider; d) in the year at issue.  In addition, the Kaiser Defendants have refused to correct (and refused to reimburse Medicare for) previously submitted risk adjustment claims when they discover, or in the exercise of reasonable care should discover, that those previously submitted claims were false.

6.      Through this scheme, Kaiser has defrauded the United States of tens of millions of dollars.

7.      Defendants' conduct alleged herein violates the federal False Claims Act.  The federal False Claims Act (the "FCA") was originally enacted during the Civil War.  Congress substantially amended the Act in 1986—and, again, in 2009 and 2010—to enhance the ability of the United States Government to recover losses sustained as a result of fraud against it.  The Act was amended after Congress found that fraud in federal programs was pervasive and that the Act, which Congress characterized as the primary tool for combating government fraud, was in need of modernization.  Congress intended that the amendments would create incentives for

individuals with knowledge of fraud against the Government to disclose the information without

fear of reprisals or Government inaction, and to encourage the private bar to commit legal

resources to prosecuting fraud on the Government's behalf.

8.      The FCA prohibits, *inter alia*: (a) knowingly presenting (or causing to be

presented) to the federal government a false or fraudulent claim for payment or approval; (b)

knowingly making or using, or causing to be made or used, a false or fraudulent record or

statement material to a false or fraudulent claim; and (c) knowingly making, using, or causing to

be made or used, a false record or statement material to an obligation to pay or transmit money

or property to the Government, or knowingly concealing or knowingly and improperly avoiding

or decreasing an obligation to pay or transmit money or property to the Government.  31 U.S.C.

§§ 3729(a)(1)(A)-(B), and (G).  Any person who violates the FCA is liable for a civil penalty of

up to $11,000 for each violation, plus three times the amount of the damages sustained by the

United States.  31 U.S.C. § 3729(a)(1).

9.      For purposes of the FCA, a person "knows" a claim is false if that person: "(i) has

actual knowledge of [the falsity of] the information; (ii) acts in deliberate ignorance of the truth

or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the

information." 31 U.S.C. § 3729(b)(1).  The FCA does not require proof that the defendants

specifically intended to commit fraud.  *Id*.  Unless otherwise indicated, whenever the words

"know," "learn," discover," or similar words indicating knowledge are used in this Complaint,

they mean knowledge as defined in the FCA.

10.     The FCA allows any person having information about an FCA violation to bring

an action on behalf of the United States, and to share in any recovery.  The FCA requires that the

Complaint be filed under seal for a minimum of 60 days (without service on the defendant during

that time) to allow the government time to conduct its own investigation and to determine whether to join the suit.

11.     Based on the foregoing laws, *Qui Tam* Plaintiff-Relator Dr. James M. Taylor, M.D. seeks, through this action, to recover damages and civil penalties arising from the false or fraudulent records, statements, and/or claims that the Defendants made or caused to be made in connection with false and/or fraudulent claims for inflated Medicare Advantage payments.

## II.     PARTIES

12.     Relator Dr. James M. Taylor, M.D. ("Relator") is a resident of Broomfield, Colorado and an employee of Colorado Permanente Medical Group ("CPMG").  Dr. Taylor joined Kaiser's Colorado branch in 1995 as a clinician, following eight years in private practice in rural Ohio.  In the early 2000s, Dr. Taylor became heavily involved with Kaiser's national Electronic Medical Record ("EMR") and physician coding practices.  He is a certified professional coder and AHIMA approved ICD-10 trainer.

13.     Dr. Taylor was elected to the Board of Directors of CPMG and served as chair for two years.  He is currently Kaiser's national co-chair of the Compliance Committee for ICD-10; a member of Kaiser's national Coding Governance Group (the only delegate representing all physicians for the Regions outside of California); and CPMG's Medical Director of Revenue Cycle/Claims.  From 2002 to 2007, he served as CPMG's Physician Director of Coding.  He is the only physician to have received Kaiser's National Revenue Cycle "Distinguished Leadership" award.

14.     He is a nationally recognized speaker on topics such as EMR documentation, coding, and compliance.  He has written articles, created webinars, and presented at national conventions for the American Health Information Association, National Health Care Anti-Fraud

Association, Health Care Compliance Association, National Health Care Auditors and Educators Association, and American Association of Professional Coders.

15.     Dr. Taylor has unsuccessfully tried, over the course of his employment at Kaiser, to address internally within Kaiser the issues set forth in this Complaint.  As described in greater detail below, as he discovered issues with the submission of false risk adjustment claims associated with specific provider types, diagnoses, or other issues, he repeatedly proposed solutions.  At times, Kaiser appeared to be taking steps (either implementing his suggestions or taking other steps) to address the problems.  Unfortunately, Relator later learned that Kaiser either did not take the steps it had claimed it was taking, or began implementing corrective actions only to stop them later.

16.     Defendant Kaiser Permanente is a non-profit managed care consortium headquartered in Oakland, California.  The consortium includes three main groups: (1) the Kaiser Foundation Health Plan, Inc. and its subsidiaries; (2) the Kaiser Foundation Hospitals and their subsidiaries; and (3) the Permanente Medical Groups.

17.     Kaiser Permanente is one of the largest managed care organizations in the United States.  Opened to public enrollment in 1945, it now boasts almost 9.5 million members throughout California, Colorado, Georgia, Hawaii, Maryland, Oregon, Virginia, Washington, and the District of Columbia.

18.     Kaiser has over 174,000 employees (including over 17,000 physicians).  In 2013, Kaiser reported more than $53 billion in operating revenue.

19.     Kaiser offers Medicare HMO plans, called "Kaiser Permanente Senior Advantage Plans," in California, Colorado, Georgia, Hawaii, Oregon, and Washington.

20.     Some regions, such as California, operate using almost exclusively Kaiser affiliated medical providers.  In these regions, Kaiser owns or controls the hospitals and physician offices that provide services to members of Kaiser's insurance plans.  In other regions, such as Colorado, Kaiser maintains more limited provider resources.  For example, in Colorado, Kaiser's members are seen by physicians in CPMG, a Kaiser affiliate.  But because Kaiser has no hospitals in Colorado, when members require inpatient or outpatient care, they are seen by non-Kaiser hospitals with whom Kaiser has contracted to provide care to its members.

21.     Defendant Kaiser Foundation Health Plan, Inc. is a non-profit health maintenance organization ("HMO") headquartered in Oakland, California.

22.     Defendant Kaiser Foundation Health Plan of Colorado is a non-profit HMO headquartered in Denver, Colorado.  It has over 585,000 members, 28 medical offices, and 7,000 staff and physicians.  CPMG, a multi-specialty physician group of over 1,000 physicians, contracts with Defendant Kaiser Foundation Health Plan of Colorado to provide medical care to its members.

23.     Defendant Kaiser Foundation Health Plan of Georgia is a non-profit health plan headquartered in Atlanta, Georgia.  It has over 270,000 members and over 20 affiliated hospitals and medical centers.  The Southeast Permanente Medical Group, a multi-specialty physician group of over 450 physicians, contracts with Defendant Kaiser Foundation Health Plan of Georgia to provide care to its members.

24.     Defendant Kaiser Foundation Health Plan of the Northwest is a non-profit HMO headquartered in Portland, Oregon.  It has over 480,000 members and is affiliated with over 900 physicians at hospitals and medical centers throughout Oregon and Washington.

## III.    JURISDICTION AND VENUE

25.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a), which specifically confers jurisdiction on this Court for actions brought under 31 U.S.C. § 3730.

26.    Under 31 U.S.C. § 3730(e) there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint.   Even if there had been any such public disclosure, Relator is the original source of the allegations herein because he has direct, independent, and material knowledge of the information that forms the basis of this Complaint, and voluntarily disclosed that information to the Government before filing.

27.    This Court has personal jurisdiction over the Defendants, pursuant to 31 U.S.C. §3732(a), as one or more Defendants can be found in, reside in, transact business in, and have committed acts related to the allegations in this Complaint in the District of Colorado.

28.    Venue is proper, pursuant to 31 U.S.C. § 3732(a), as one or more Defendants can be found in, reside in, and/or transact business in the District of Colorado, and because many of the violations of 31 U.S.C. § 3729 discussed herein occurred within this judicial district.

## IV.    LEGAL BACKGROUND

### A.    Medicare

29.    Medicare is a federally-funded health insurance program which provides for certain medical expenses for persons who are over 65, who are disabled, or who suffer from End Stage Renal Disease.  The Medicare program is administered through the Department of Health and Human Services, Centers for Medicare and Medicaid Services ("CMS").

30.    The Medicare program has four parts: Part A, Part B, Part C and Part D. Medicare Part A ("Part A"), the Basic Plan of Hospital Insurance, covers hospital services and

post-hospital nursing facility care.  Medicare Part B ("Part B"), the Voluntary Supplemental

Insurance Plan, covers services performed by physicians and certain other health care providers,

such as services provided to Medicare patients by physicians, laboratories, and diagnostic testing

facilities.  *See* 42 U.S.C. §§ 1395k, 1395l, 1395x(s).  Medicare Part C ("Part C") refers to

Medicare's managed care plans.  Medicare Part D ("Part D") provides subsidized prescription

drug coverage for Medicare beneficiaries.

### 1.      Medicare Managed Care (Parts C and D)

31.      Traditionally, Medicare operates on a fee-for-service basis, meaning that

Medicare directly pays hospitals, physicians, and other health care providers for each service

they provide to a Medicare beneficiary.

32.      In 1997, Congress created Medicare Part C, which provides similar benefits to

Medicare members, but does so based on a managed care model, rather than the traditional fee-

for-service model.  Under Part C, rather than pay providers directly, Medicare pays private

managed care plans (later named "Medicare Advantage" or "MA" plans) a capitation rate (per

member per month) and those plans are responsible for paying providers for the services they

provide to members of that specific MA plan.

33.      In 2003, Congress passed the Medicare Prescription Drug, Improvement, and

Modernization Act, creating Medicare Part D which provides prescription drug coverage.

Although a limited number of Medicare Part D plans are operated under a cost-reimbursement

contract, the plans are generally financed under a managed care model.  These managed care

model plans are provided under both Part D prescription drug plans, which offer only

prescription drug coverage, and Part C plans, which integrate the prescription drug coverage with

the Part C health care coverage.

34.     This Complaint refers, collectively, to Medicare Advantage plans with and without Part D coverage, and stand-alone managed care Medicare Part D Plans as "Medicare Advantage Plans" or "MA Plans."

> a.      **Risk Adjusted Capitation Payments and Claims Submission**

35.     CMS pays MA plans a monthly capitation rate that reflects, among other things, each member's health status.  The process of adjusting the capitation rate to reflect a member's disease states is known as risk adjustment.  Risk adjustment is intended to improve the accuracy of the payments CMS makes to these plans.  To this end, CMS pays a higher rate for enrollees whom the MA plan represents were treated for certain diseases and conditions in the previous year, based on the expectation that those enrollees will require treatment and/or management for the conditions in the payment year.  *See* 2008 Risk Adjustment Training for Medicare Advantage Organizations Participant Guide ("*Participant Guide*"), at 6.4.1 (for purposes of this Complaint, "treatment" is defined as treatment and management within the meaning of the *Participant Guide*).

36.     Conversely, CMS pays a lower rate for enrollees who, although they may have certain typically expensive conditions, did not require care, treatment, or management for those conditions in the prior year.  For these members, the risk adjustment methodology assumes that because their condition did not require treatment in the prior year, it has improved or otherwise changed so that it is not expected to require treatment in the payment year.

37.     The CMS risk adjustment model evaluates enrollee health (and establishes risk adjustment payment rates) using diagnosis classifications set forth in the International Classification of Diseases, 9th Edition, Clinical Modification ("ICD-9") system.  The ICD-9 system assigns each diagnosis a specific code, which is "used to describe the clinical reason for a

patient's treatment." *Participant Guide* at 6.2.  Under the MA model, these individual diagnosis codes are organized into groups, called Hierarchical Condition Categories ("HCCs").  Medicare Managed Care Manual ("MMCM"), ch. 8, § 50.  Every HCC consists of several ICD-9 diagnosis codes that are clinically related and are expected to require a similar level of resources to treat. *Id*.  Seemingly similar diagnoses may fall into different HCCs when they are expected to require significantly different levels of treatment.

38.     CMS uses the same general model for the Part D portion of risk adjustment. However, because certain diagnoses will be expected to require higher spending for prescription drugs covered under Part D, but not hospital costs and physician fees covered under Part C, and vice versa, a distinct list of Hierarchical Condition Categories ("RxHCCs") with corresponding diagnosis codes was created for Medicare's Part D risk adjustment.  *See Participant Guide* at 8.2.5.2.  For example, RxHCC 75 represents Attention Deficit Disorder, a condition predicted to increase drug spending.  However, because Attention Deficit Disorder is unlikely to result in hospitalization, RxHCC 75 has no corresponding HCC.  On the other hand, HCC 77, Respirator Dependence/ Tracheostomy Status, a condition category predictive of Medicare Part C medical costs but not necessarily predictive of Part D drug expenses, has no RxHCC equivalent.

39.     Although the HCC and RxHCC systems are not identical, they do have significant overlap.  Certain HCCs have equivalent RxHCCs, meaning that the condition categories consist of identical ICD-9 diagnosis codes.  For example, HCC 5 (Opportunistic Infections) is equivalent to RxHCC 2 (Opportunistic Infections), and HCC 37 (Bone/Joint/Muscle Infections/Necrosis) is equivalent to RxHCC 39 (Bone/Joint/Muscle Infections/Necrosis).  Even where they are not identical, most HCCs overlap with one or more RxHCCs.  For example, of the thirty-seven diagnosis codes that fall within HCC 45 (Disorders of Immunity), twenty-seven fall within

RxHCC 52 (Disorders of Immunity), seven fall within RxHCC 51 (Severe Hematological Disorders), and three do not fall within any RxHCCs.  Thus, the majority of ICD-9 diagnosis codes that fall into an HCC will also fall into an RxHCC.

40.     An individual ICD-9 code included in the HCC system for a particular member corresponds on average to nearly $3,000 in extra revenue for the plan per year.

41.     Generally speaking, an MA Plan may only submit a risk adjustment claim for a diagnosis that has been properly coded per ICD-9 standards.  *See* 42 C.F.R. § 422.310(d)(1) (risk adjustment data must conform to national standards); *Participant Guide* at 7.1.5 (diagnoses must be "[c]oded in accordance with the ICD-9-CM Guidelines for Coding and Reporting").

42.     In addition, a risk adjustment claim may only be submitted if the diagnosis meets four additional requirements.  First, the diagnosis must have been <u>treated or affected treatment</u> provided to the patient.  *See Participant Guide* at 7-14 ("Code all documented conditions that coexist at time of the encounter/visit, and require or affect patient care treatment or management."); *id*. at 6-4.1 ("Physicians should code all documented conditions that co-exist at the time of the encounter/visit, <u>and</u> require or affect patient care treatment or management." (emphasis added)); *id*. at 7-13 ("for hospital inpatient stays . . . diagnoses that relate to an earlier episode which have no bearing on the current hospital stay are to be excluded").

43.     Second, the diagnosis must have been treated (or affected treatment provided) during a <u>face-to-face visit</u> between the provider and the patient (unless the provider is a pathologist).  *See Participant Guide* at 7.1.4 ("As a principal risk adjustment rule, risk adjustment diagnoses submitted for enrollees must be supported by medical record documentation and based on a face-to-face encounter."); *id*. at 7.1.5 (Diagnoses must be "based on a face-to-face health service encounter").

{00061328; 1 }                                    12

44.     Third, the provider rendering the service must be a <u>qualified provider type or specialty</u>. *See Participant Guide* at 2.2.1, 3.1.4, 3.2, 4.3, 4.7, 4.11 (risk adjustment diagnoses can come from three broad categories: hospital inpatient facilities, hospital outpatient facilities, and certain physician and physician extender specialties); *see also id.* at 6.1 (MA plans must "[i]mplement procedures to ensure that diagnoses are coming from physician, hospital inpatient, or hospital outpatient provider types."). CMS has enumerated the physician specialties that are an acceptable source of diagnoses for risk adjustment purposes. *See id.* at 3.2.3 ("Only those physician specialties and other clinical specialists identified in Table 3H are acceptable for risk adjustment."). Certain non-physician professionals are also acceptable provider types for risk adjustment, including, *inter alia*, physical therapists, occupational therapists, and physician assistants. *Id* at 3.2.3.

45.     Fourth, the service used as the basis for the risk adjustment claim must have <u>occurred during the calendar year preceding the payment year</u>. *See Participant Guide* at 7-11 ("Do not submit medical records for date(s) of service that occurred outside of the data collection period."); *id*. at 7.2.4.1 (Unacceptable medical record documentation includes "documentation for dates of service outside the data collection period"); *id.* at 2.2.1 ("All beneficiary ICD-9-CM diagnosis codes required for the CMS-HCC risk adjustment model must be reported at least once per enrollee in the data collection period."); *id*. at 6.4.1 ("[C]o-existing conditions should be documented by one of the allowable provider types at least once within the data reporting period.").

46.     CMS has offered specific additional guidance regarding certain practices or diagnoses known to be at particular risk of abuse. For example, clinicians frequently use what are known as "problem lists" to track diagnoses a patient has had in the past or that the treating

provider believes the patient may have.  For ease of use, a physician may copy the problem list into the patient chart during an encounter with a patient.  This allows the physician to consider whether any issues on the problem list require assessment or treatment or are otherwise clinically relevant.  However, in most cases, the fact that a diagnosis appears on a problem list does <u>not</u> in and of itself indicate the physician's judgment that the diagnosis was relevant to the clinical encounter.  This is because diagnoses may appear on problem lists for many reasons, including for the purpose of <u>ruling out</u> a diagnosis.  For this reason, CMS requires that if a diagnosis from a problem list is submitted for risk adjustment purposes, the list must be comprehensive "and show evaluation and treatment for each condition that relates to an ICD-9 code on the date of service."  *Id*. at 7-17.

47.     However, for chronic conditions such as diabetes, which affect "all but the most minor of medical encounters," as well as chronic conditions such as multiple sclerosis, which "may not impact every minor healthcare episode," the documentation need only reflect that the condition was "part of a general overview of the patient's health when treating co-existing conditions" or was otherwise "evaluated" by the provider.  *Id*. at 6.4.1.

48.     Another common source of false risk adjustment claims is erroneous application of the rule for coding conditions which were previously treated, but are currently cured, in remission, or otherwise inactive.  In such cases, the provider should not code the diagnosis as active when in fact the patient only has a "history of" the diagnosis.  For example, a diagnosis of "history of stroke" or "history of cancer," does not risk adjust (*i.e.*, may not be used to support a claim for risk adjustment payments).  However, a diagnosis of active cancer or a stroke occurrence will risk adjust.  Because of this, CMS requires clinical specificity and that

physicians code "the correct forms and manifestations of diseases and conditions," including

whether the patient has an active condition or a history of such. *Id*. at 6.4.3, 6-8.

49.     CMS rules also prohibit the submission of risk adjustment claims for diagnoses

that are unconfirmed, unless the treating provider was a hospital inpatient department. *Id*. at

6.4.2 ("Physicians and hospital outpatient departments shall not code diagnoses documented as

'probable,' 'suspected,' 'questionable,' 'rule out,' or 'working.'").

50.     The risk adjustment claims that the MA Plan submits to CMS must include:

        (a)     the member's Health Insurance Claim ("HIC") number;

        (b)     the ICD-9 diagnosis code;

        (c)     the "service from" date;

        (d)     the "service through" date; and

        (e)     the provider type (*e.g.*, hospital inpatient, hospital outpatient,

                physician).

51.     MA plans are responsible for the content of their risk adjustment claims

submissions to CMS, regardless of whether they submit the data themselves or through an

intermediary. *Participant Guide*, at 3-13.  Before submitting data to CMS, MA plans are

required to filter the data "to ensure that they submit data from only appropriate data sources."

*Id*. at 4-11.  For example, filters should include checking that physician data comes from face-to-

face encounters with members and ensuring that data does not come from non-covered providers,

such as diagnostic radiology services.

52.     MA plans are required to correct the risk adjustment data they submit to CMS.

When an MA plan learns that information in a risk adjustment claim (*i.e.*, HIC number, diagnosis

code, service dates, or provider type) contains an error, it must submit a "delete record" to CMS for that claim.

53.     To test the validity of MA plan risk adjustment data, CMS conducts Risk Adjustment Data Validation ("RADV") audits after the final deadline for submitting risk adjustment data for the payment year.  During such audits, CMS "validates" some of the MA plan's HCC scores by reviewing the medical records that the plan contends support the claimed diagnosis codes.  *Id*. at 7-1.  To facilitate the RADV audits, MA plans are required to submit to CMS medical records and coversheets for each sampled enrollee.  Until February 2012, MA plans were required to include the "one best medical record" supporting each HCC.  *Id*. at 7-9.  Beginning with the CY 2011 RADV audit, CMS began allowing audited MA contracts to submit multiple medical records for each HCC being validated.  CMS, *Notice of Final Payment Error Calculation Methodology for Part C Medicare Advantage Risk Adjustment Data Validation Contract-Level Audits*, February 24, 2012.

            **b.     CMS Requires MA Plans To Certify the Validity of Their Bid Rates
                     and Risk Adjustment Data To Prevent Fraud**

54.     CMS requires MA organizations to submit attestations, each signed by the CEO or CFO (or their authorized, direct subordinate), certifying the accuracy of their risk adjustment submissions.  These attestations are a condition that the MA plans must meet to be eligible to receive any capitation payments from CMS.

55.     The first attestation, which is submitted annually, requires the MA organization to attest that the risk adjustment data it submits annually to CMS is "accurate, complete, and truthful."  The attestation acknowledges that risk adjustment information "directly affects the calculation of CMS payments . . . and that misrepresentations to CMS about the accuracy of such information may result in Federal civil action and/or criminal prosecution."  The regulations also

provide that if the claims data are generated by a "related entity, contractor, or subcontractor of an MA organization," that entity must similarly certify the "accuracy, completeness, and truthfulness of the data."  42 C.F.R. § 422.504(l)(2).

56.     Kaiser Colorado CFO Rick Newsome signs this attestation for Kaiser Colorado. Mr. Newsome typically has his subordinates, such as Relator, sign "sub-attestations" concerning their knowledge of the validity of the data.  At times, Relator has signed such attestations, based on his then-belief that Kaiser was taking steps to fix the problems he had identified.  However, in approximately 2011, Relator refused to sign the sub-attestation because he learned that Kaiser had not followed through on promised corrective actions.  The Kaiser employee responsible for collecting the sub-attestation responded by saying: "I'll just get another person to sign it."

57.     In subsequent years, Relator signed the attestations only after assurances that additional corrective actions had been or would be taken.  Unfortunately, Relator has come to the conclusion that Kaiser does not intend to correct the problems described in this Complaint, to stop submitting false claims of the type described herein, or to repay the United States for the overpayments that Kaiser knows, or in the exercise of reasonable care would know, it has received due to previously submitted false claims.

58.     In addition, the MA organization (and any third-party submitters) must sign an Electronic Data Interchange ("EDI") Enrollment Form prior to submitting risk adjustment data to CMS.  The EDI Enrollment Form is a contract between the MA organization and CMS attesting to the accuracy of the data submitted. *Participant Guide* at 4.1.  The MA organization attests on the Form "[b]ased on best knowledge, information, and belief," that it will submit risk adjustment data that are accurate, complete, and truthful.

## V.     ALLEGATIONS

### A.     Kaiser Has Knowingly Submitted False Claims for Risk Adjustment Payments and Improperly Retained Such Payments

59.     The Kaiser Defendants have engaged in a deliberate scheme to defraud the United States by submitting thousands of false claims for risk adjustment payments to CMS.  Kaiser has submitted and caused the submission of these claims for risk adjustment payments even though it knew, or in the exercise of reasonable care should have known, that the Medicare patients upon whom the claims were based did not have the claimed diagnoses, had not been treated for those diagnoses in the prior year in a face-to-face visit with an appropriate provider type, or that the claims were otherwise ineligible for risk adjustment payments under CMS rules.

60.     As outlined below, Kaiser routinely conducted national, regional, and diagnosis-specific audits to determine the accuracy of its risk adjustment claims submissions.  These audits regularly identified categories of claims (often, specific diagnoses) that had high rates of falsity. Notwithstanding this knowledge, Kaiser rarely took even minimal steps to filter its claims to prevent submission of these claims, or to audit prior submissions to find the previously submitted false claims.

61.     The limited steps Kaiser did take, when it did so, to filter certain diagnoses further confirmed that physicians often upcoded those diagnoses, leading (absent intervention) to the submission of false claims.  Despite this knowledge, Kaiser did not apply this filter to its prior years' submissions for these overcoded diagnoses.

62.     This lack of diligence contrasts starkly with Kaiser's considerable efforts and substantial commitment of resources to audit current and past claims to identify new diagnoses that it could use to submit additional risk adjustment claims and thereby increase the amount of the risk adjustment payments it receives from CMS.

63.     Kaiser's refusal to take reasonable steps to prevent the submission of false claims, and to make a reasonable inquiry into previously submitted false claims, constitutes reckless disregard as to, and/or deliberate ignorance of, the falsity of those claims.

64.     So too, in certain instances, Kaiser had actual knowledge that specific claims it previously submitted to CMS were false.  Kaiser's refusal to delete those claims and refund the resulting overpayments to the United States also constitutes a violation of the False Claims Act.

65.     Although many of the representative examples detailed below are for Kaiser's Colorado Region, Relator has information and believes, based on reports he has reviewed showing audit results for other regions and Kaiser nationally, his attendance at Regional Reporting Group ("RRG") Meetings, and work with employees in other Kaiser regions, and on that basis alleges, that some or all of Kaiser's other regions knowingly submitted false risk adjustment claims for similar reasons and for similar diagnosis codes as Kaiser Colorado.

66.     On the basis of reviewing the audit results for other regions and Kaiser nationally, his attendance at RRG Meetings and work with employees in other Kaiser regions, Relator alleges on information and belief that at all times material to this action, i.e., from at least 2004 to present, the fraudulent risk adjustment practices identified herein regarding Colorado were typical of the Kaiser Defendants at some or all of its other regions, including without limitation, Georgia, Hawaii, Oregon and Washington.

67.     In addition, although many of the representative examples detailed below cover HCCs rather than RxHCCs, to the extent that Kaiser's audits also covered RxHCCs (which many of them did), they identified similar patterns of knowing submission of false claims for RxHCCs.

68.     On this basis, Relator alleges that Kaiser has submitted, and fraudulently refused to delete and repay CMS for, tens of thousands of risk adjustment claims, that it knows, within the meaning of the False Claims Act, are false and/or fraudulent.

**1.     Kaiser Knows It Is Routinely Submitting False Risk Adjustment Claims to CMS**

69.     Every year, Kaiser's National Compliance Office ("NCO") conducts a nationwide "Probe" audit to test the accuracy of risk adjustment claims submitted the prior year.  The NCO chooses the patients and/or diagnoses to be audited but each region conducts the audit work. Kaiser deliberately designs these audits so that the sample size is too small for the results to be used for statistically significant extrapolation with respect to the error rates for individual HCCs. Instead, it is intended to provide an overall accuracy rate, by region, and to serve as a "flag" or "tripwire" to identify potential problems with individual HCCs.

70.     In addition to the annual Probe Audits, Kaiser conducted nationwide audits in anticipation of CMS's Risk Adjustment Data Validation ("RADV") audits.  These pre-RADV audits routinely identified similar problems as the Probe Audits.

71.     Although these Probe and other audits show an overall trend of increasing accuracy in risk adjustment claims across Kaiser, and for each of its regions, the audits have identified many errors and put Kaiser on notice that it has submitted and continues to submit a substantial number of false risk adjustment claims each year.

72.     For the Colorado region, the annual Probe Audits identified the following error

rates (including both HCCs and RxHCCs) between 2007 and 2013:

| Year | Total HCCs Audited | Errors | Error Rate |
|---|---|---|---|
| 2007 | 207 | 25 | 12% |
| 2008 | 131 | 19 | 15% |
| 2009 | 330 | 38 | 12% |
| 2010 | 428 | 70 | 16% |
| 2011 | 395 | 56 | 14% |
| 2012 | 398 | 29 | 7% |
| 2013 | 238 | 21 | 9% |

73.     Kaiser's audits of other regions, and of national error rates, showed similar

results.  For example, in both 2006 and 2007, Kaiser conducted pre-RADV audits.  Kaiser's

audits found an error rate of between 14% and 16% (depending on how strictly certain rules were

applied).

74.     These Probe, pre-RADV and other ad hoc audits show consistent errors in certain

types of risk adjustment claims across the Kaiser system.  For example, many of the errors in the

2006 and 2007 national RADV audits were for issues or diagnoses that repeatedly show up as

upcoded in subsequent Probe Audits in Colorado and elsewhere, such as coding historical

conditions as active, improperly coding based on probable, suspected or rule out diagnoses, and

coding for specific diagnoses such as cancer, arrhythmia, stroke, vascular disease, ulcers,

vertebral fractures, major depression, and diabetes with complications.

75.     Similarly, results from a 2008 Probe Audit across all Kaiser regions showed a 15% error rate for HCC risk adjustment claims, and an 11% error rate for RxHCC risk adjustment claims.  The results for individual regions ranged from error rates of 5% to 20%.

76.     A September 16, 2008 PowerPoint presented at the Fall 2008 Regional Reporting Groups ("RRG") Meeting indicated that the overall error rate across all Kaiser regions was approximately 13% for the 2007 Probe Audit, and 27% for the 2006 Probe Audit.  The Regional Reporting Groups are comprised of representatives from each Kaiser Region who are responsible for conducting audits and other initiatives related to risk adjustment.  Therefore, by presenting them at the RRG Meeting, these results were distributed widely throughout Kaiser.

77.     Similarly, in an April 22, 2008 PowerPoint presented at the RRG Spring Conference, Kaiser personnel identified as "common coding issues" from prior audits several of the diagnoses discussed in greater detail below such as: (a) "Old MI versus acute MI;" (b) "Late effect of [stroke] or history of [stroke] versus acute [stroke];" (c) "History of cancer versus active cancer"; and (d) issues with renal insufficiency coded as chronic kidney disease.

78.     The April 22, 2008 PowerPoint also identified coding issues found in the 2006 pre-RADV audit (looking at 2005 risk adjustment claims based on 2004 clinical data).  Problems identified included: (a) MI; (b) ulcers; and (c) cancer.  Other diagnoses that routinely show up as erroneous in audits of regions other than Colorado include inappropriate linkage of complications to diabetes.

79.     The September 16, 2008 PowerPoint discussing the 2006 and 2007 Probe Audit findings observed that some of the problem areas identified by the audits included several of the issues discussed in greater detail below, including: (a) "History of condition vs. current condition" and (b) "Impact of external provider records."

80.     In 2010, Kaiser's Northern California Region audited data in its claims systems for care provided to patients in 2009.  Of the "Top Ten Failed HCCs by Volume" were several that the Colorado region also found to be routinely problematic, including HCCs for cancer, stroke, arrhythmia, and vascular disease.  This audit will be discussed in greater detail below.

81.     Examples of risk adjustment claims that the Kaiser audits have identified as routinely false include:  (a) false claims submitted based on diagnoses from external providers, (b) high rates of diagnosis specific false claims identified during the Probe Audits; (c) false claims submitted due to other process-based coding violations; and (d) diagnoses that Kaiser identified as upcoded through the use of its "high risk" filter program.  These examples (described below) are illustrative of the types of false claims of which Kaiser had knowledge but they do not include each and every false claim.

82.     As described in sections V.A.2 and V.A.3. below (paragraphs 169 -190), despite its knowledge that the categories of risk adjustment claims described below are false a significant percentage of the time, Kaiser routinely fails to take reasonable steps to identify which of these claims are false (*i.e.*, Kaiser does not extend its review beyond the discrete audit sample and into previous years' claims submissions), and then to prevent their submission in the first place or to delete them after submission.  Instead, Kaiser's reaction to this knowledge on a national and regional level has been (except in isolated instances) to avoid conducting retrospective audits to correct previously submitted false data.

        **a.     False Claims Submitted Based On Diagnoses from External Providers**

83.     Several of Kaiser's regions rely heavily on external providers (hospitals or other facilities who are not owned by Kaiser) to provide inpatient care to Kaiser's HMO members.  These regions include Colorado, Hawaii, and, until recently, Georgia.

84.     These external providers submit claims to Kaiser for services provided to Kaiser members.  Kaiser then uses the diagnoses from these claims as the basis for risk adjustment claims Kaiser submits to CMS.

85.     Kaiser Colorado relies on diagnoses submitted by external providers to support 10% to 13% of its risk adjustment claims.

86.     Kaiser's Probe and other audits have identified significant error rates in risk adjustment claims Kaiser submitted to CMS based on diagnoses provided by external providers.

87.     For example, for the Colorado region, the error rates for internal providers were as follows:

| Year | Internal HCCs Audited | Errors | Error Rate |
|---|---|---|---|
| 2007 | 156 | 14 | 9% |
| 2008 | 119 | 11 | 9% |
| 2009 | 277 | 29 | 10% |
| 2010 | 371 | 47 | 13% |
| 2011 | 340 | 27 | 8% |
| 2012 | 370 | 18 | 5% |
| 2013 | 227 | 14 | 6% |

88.     The error rates for external providers have been up to ten times higher:

| Year | External HCCs Audited | Errors | Error Rate |
|---|---|---|---|
| 2007 | 51 | 11 | 22% |

| 2008 | 12 | 8 | 67% |
|---|---|---|---|
| 2009 | 53 | 9 | 17% |
| 2010 | 57 | 23 | 40% |
| 2011 | 56 | 26 | 46% |
| 2012 | 28 | 11 | 39% |
| 2013 | 11 | 7 | 64% |

.

89.     The error rates for certain large hospitals in particular are striking.  For example,

the 2011 Probe Audit found that:

  a.  Exempla Good Samaritan Medical Center had an error rate of 93% (12 of

    14 HCCs reviewed were erroneous);

  b.  Exempla Lutheran Medical Center had an error rate of 100% (4 of 4 HCCs

    reviewed were erroneous);

  c.  Exempla St. Joseph Hospital had an error rate of 67% (32 of 36 HCCs

    reviewed were erroneous);

  d.  Pueblo Clinic had an error rate of 92% (11 of 12 HCCs reviewed were

    erroneous); and

  e.  Swedish Medical Center had an error rate of 73% (9 of 11 HCCs reviewed

    were erroneous).

90.     In the 2012 Probe Audit, Exempla St. Joseph again showed an elevated error rate

of 42% (5 of 12 HCCs were wrong).

91.     In the 2010 Probe Audit, Exempla Good Samaritan had an error rate of 40% (4 of 10 HCCs), Exempla St. Joseph had an error rate of 52% (9 of 17 HCCs), and Swedish Medical Center had an error rate of 40% (3 of 5 HCCs).

92.     The Exempla chain hospitals are the primary providers of inpatient care for Kaiser patients in Colorado, making their consistently elevated error rates of particular concern.

93.     This is not just a problem in the Colorado Region.  For example, a September 16, 2008 PowerPoint presented at the Fall 2008 RRG Meeting flagged diagnoses submitted by external providers as one of the top sources for false claims in other regions.

94.     For this reason, most Kaiser regions subject diagnoses submitted solely by external providers to enhanced scrutiny.  The Northern California, Hawaii, and Northwest Regions review all (or nearly all) HCCs that are supported only by a diagnosis from an external provider.  The Georgia and Southern California regions conduct targeted samples of some claims provided by certain high volume external providers.

95.     Kaiser Colorado's executives are aware that this is a continuing issue.  For example, the Kaiser CFO, CPMG Associate Medical Director (Vice President), CPMG CFO, and Executive Director of Revenue Cycle have all been present at meetings where the results of annual Probe Audits were discussed.

96.     Moreover, around late 2011, Treska Francis, the leader of the Kaiser Colorado coder group, personally performed an audit of about 100 diagnoses received from Exempla St. Joseph's Hospital and Exempla Good Samaritan Medical Center.  She found a 40% to 60% error rate.  She reported this to her boss, the Manager of Medicare Risk Business Services, who ignored the report.  Treska then reported the problem to her boss' boss, Tom Rennell, Executive Director of Revenue Cycle for Kaiser Colorado.  Mr. Rennell told her to "leave it alone."

97.     Later, at Relator's urging, Kaiser Colorado began another audit of external hospitals.  The audit was supposed to cover three southern Colorado hospitals.  One hospital refused to participate.  The initial results from the other two hospitals (18% of the 357 diagnoses audited at St. Thomas More Hospital were invalid; 20% of the 678 diagnoses at Memorial Hospital were invalid) were described in the Kaiser Colorado Medicare Initiative Meeting as "unsettling" and "disturbingly high."  Relator does not know if the audit was ever completed, but the final results were never released.

98.     Despite knowing of the consistent errors in claims data from external providers, Kaiser Colorado does not conduct any routine targeted audits of claims submitted by external providers.  This is particularly egregious because the Colorado region does have a coder review each hospital stay at an external provider to look for additional diagnoses present in the chart but not coded by the treating physician.  These coders do not attempt to validate the codes submitted by the hospital.  These are simply passed through to CMS for payment.

99.     For years, Relator has requested that a filter be created to tag high-risk codes from external providers for review.  Instead, Kaiser Colorado created a filter to review codes received from internal providers.

100.     Moreover, despite Kaiser Colorado's consistent problems with data from external providers, it has not performed larger audits or instituted a pre-submission review.  In fact, Kaiser Colorado's only action appears to have been to attempt to stop reporting error rates associated with data from external providers separately from error rates associated with data from internal providers, so as not to call attention to the problem.  The initial version of the 2013 Probe Audit did not identify whether errors were from internal or external providers.  Relator insisted that the audit be reopened and amended to add this information.

**b.      High Rates of False Claims Identified During Probe Audits**

101.    The following are examples of diagnoses and HCCs identified as frequently

upcoded during Kaiser's Probe Audits.  Although Relator has the most knowledge about the

Probe Audit results from the Colorado Region, he also knows, from his attendance at RRG

meetings and work with other Kaiser regions, that these HCCs often were found to be upcoded in

other regions as well.  Moreover, these are not all of the problematic HCCs that were identified

for either the Colorado Region or for other regions; instead, they are representative examples of

some of the top problems Relator identified and are illustrative of the types of false claims that,

during the times relevant to this action (i.e., from 2004 to present), Kaiser submitted to CMS.

102.    <u>Cancer</u>:  Kaiser's Probe Audits have consistently identified cancer (HCCs 7 – 10)

as the most upcoded condition.  Improper claims for diagnoses of active cancer have shown up in

every single Probe Audit from 2006 to 2013.

103.    The most significant and consistent error is that Kaiser providers submit diagnosis

codes representing active, current treatment of cancer when, in fact, the patient's cancer is cured,

in remission, or otherwise irrelevant to the services provided to the patient.

104.    A diagnosis of cancer is permissible under the ICD-9 coding guidelines when

there is evidence of active disease.  Where a diagnosis of active cancer appears, one would

expect to see evidence of treatment (chemotherapy, radiation, surgery, or palliative care) in the

patient's medical chart as well.

105.    Once there is no evidence of an existing malignancy, the proper diagnosis code is

for "history of cancer."  "History of cancer" diagnoses fall within the v10 category of HCC

codes and do not risk adjust.

106.    Colorado is not the only Kaiser region to have significant problems with the submission of false risk adjustment claims for cancer.  At RRG meetings attended by Relator, all other Kaiser regions have noted that they also consistently find high error rates in their risk adjustment claims where a patient has a history of cancer improperly coded as active cancer.  This is consistently the biggest issue in the annual Probe Audits across the Kaiser organization.

107.    The source of these errors is in part historical.  Kaiser's physician groups, since 2004, have used an EMR system called HealthConnect.  When Kaiser first launched HealthConnect, physicians could not easily enter a diagnosis of "history of cancer" – it simply was not an option in the drop-down menu of diagnoses.  Instead, physicians would code a diagnosis of active cancer and note "history of" in the comments field.  Although Kaiser has long known this is a problem, when the data from these charts is filtered for submission to CMS, only the diagnosis code of active cancer is submitted and the notation of "history of" is ignored for purposes of data submission to CMS.

108.    Although HealthConnect (Kaiser's EMR) now has "history of" codes available, physicians are still accustomed to documenting "history of cancer" in this way (i.e., coding active cancer and noting "history of cancer" in the comments field).

109.    In an attempt to identify how big a problem this was, in 2007 Dr. Taylor conducted an audit of over 6,000 risk adjustment claims for Breast or Prostate cancer submitted by CPMG physicians in 2006 and 2007.  The audit showed an error rate of 78% for breast cancer and 52% for prostate cancer, resulting in more than $6 million dollars in false claims.  Kaiser deleted the false claims identified in this audit and, accordingly, refunded the overpayments to CMS.

110.     Based on these findings, Relator convinced Kaiser Colorado to make changes to its EMR system to try to "prompt" physicians to change their coding behavior.  HealthConnect, Kaiser's EMR, was modified so that every time a CPMG physician entered a diagnosis of cancer an alert would pop up, offering a brief explanation of when a diagnosis of active cancer is appropriate and ensuring that was the intended diagnosis as opposed to history of cancer.  For example, the breast cancer pop up said:

> "DISEASE MANAGEMENT REMINDER: To use this diagnosis, you must have documented in your note that the cancer is active or exists and/or the current treatment for the cancer.
>
> ACTION: IF NOT ACTIVE, use History of Breast Cancer – enter Hx Breast in the Encounter Diagnosis field to select."

111.     The use of this pop-up alert reduced the error rate substantially – to an accuracy rate of 96% for breast cancer and 93% for prostate cancer.

112.     Unfortunately, this fix was short-lived.  In 2010, Kaiser turned off the alert  and replaced it with a limited internal filter.  This "filter" program is discussed in greater detail below.

113.     With the manual review associated with the filter, the error rate in Kaiser Colorado for improper cancer diagnoses remained below the error rates seen before the alert was implemented.  However, in late 2011 or early 2012, Kaiser Colorado decided to turn off the filter to save money and coding resources.  As shown by the Probe Audits since, the error rate for cancer diagnoses has rebounded.  Despite the fact that the alert and filter were obviously preventing the submission of false claims, Kaiser has not turned either back on.

114.    Moreover, despite the substantial volume of cancer HCC submissions, and increased error rates since the filter was turned off, Kaiser Colorado has not conducted another broad cancer audit such as the one performed in 2007.  Instead, Kaiser has responded to the renewed evidence of high cancer error rates with only limited and prospective fixes.

115.    For example, Kaiser Colorado's corrective action plan ("CAP") developed after the 2011 Probe Audit called for targeted retrospective audits of diagnoses of active cancer. However, to Relator's knowledge, no such audits were ever performed.  The CAP similarly called for Relator and Dr. Teresa Welsh, the CPMG Physician Director of Coding, to visit the CPMG oncologists and discuss the coding accuracy of their cancer diagnoses.  Dr. Welsh conducted some follow-up training, but reported back to Relator that, to be effective, such training would have to be done annually given the high turnover rate for oncologists.  Kaiser does not conduct this training annually.

116.    For years, Relator has recommended a broad retrospective audit of diagnosis codes known to be problematic, including cancer.  In 2011, Kaiser Colorado hired an external vendor to conduct such an audit.  This was known as the "Peak" project.  Relator believes that part of this project was to review past cancer diagnoses submitted for risk adjustment to CMS. Any findings of the Peak audit have been withheld from Relator.  However, he was told by Treska Francis, the leader of the Kaiser Colorado coder group, shortly after the audit began that the findings were "not looking good," *i.e.*, that the error rates were substantial.

117.    **Stroke**: Kaiser identified problems with claims submitted for HCC 96, Ischemic or Unspecified Stroke, in Probe Audits conducted in 2006 (2007 audit of 2005 data), 2009, 2010, and 2011.

118.    As with cancer, Kaiser knew stroke was commonly coded as an active event, when, in fact, the patient should have been classified as having a history of stroke.  A diagnosis of a cerebrovascular accident (CVA)/stroke (ICD-9 codes 430-437) is appropriate for the initial acute stroke episode.

119.    During RRG meetings, Relator learned that CVA/stroke is a diagnosis for which all Kaiser regions show high error rates, especially Kaiser's Northwest Region (Oregon and Washington).

120.    Given the clinical profile of acute stroke, it would be particularly easy for Kaiser to audit past claims submissions and/or filter current claims to address this issue before submission.  In almost all cases, when a patient is having a stroke she is treated in a hospital.  A patient typically is not allowed to leave the hospital until after the stroke is over.  Once the acute incident is over, the patient should be diagnosed as either having a history of stroke, or receiving treatment for the late effects of the prior stroke.  Thus, in almost all cases, if a physician submits a diagnosis for acute stroke for a patient treated in the physician's office (or any setting other than a hospital), that diagnosis is likely erroneous.

121.    Applying this principle, Relator convinced Kaiser to fund a pilot project to have a physician review all of the acute stroke diagnoses made in CPMG physician offices in 2010.  Dr. Christina Marchioni, the CPMG physician who performed the review determined that Kaiser had submitted to CMS approximately $3.1 million in false acute stroke claims during the audit period.  In fact, he determined that all but two of these claims were false.  He also determined that Kaiser could have submitted replacement claims for treatment of the after effects of stroke for these patients, worth approximately $1.2 million per year.

122.     Despite these results, Kaiser did not delete these erroneous codes (and, correspondingly repay CMS), or conduct a similar audit for prior years.  Instead, Kaiser simply had the reviewing physician correct the problem list in the patient's chart to reflect that the patient had a "history of stroke" or the "late effects" of stroke to minimize the chance that the error would be repeated in future years.

123.     This project temporarily reduced the error rate for risk adjustment claims submitted for stroke in the following year.  However, in 2011 Relator's funding for this project was cut and the work stopped.  Since then, the error rate for stroke diagnoses has increased again.

124.     Relator has recently begun a new program whereby all claims for an acute stroke diagnosis submitted based on an office visit by an internal provider are flagged for further review by Kaiser Colorado coders.  If the coders identify errors, they reach out to the internal provider that submitted the diagnosis and ask her to correct the error.  Unfortunately, the coders are not authorized to correct the errors themselves to prevent the false claims from being submitted, or to compel the internal providers to correct their errors.  Thus, approximately 25% to 30% of the errors the coders identify are ultimately submitted to CMS as risk adjustment claims because the internal provider that submitted the diagnosis ignores the coders' efforts to correct the code.

125.     **Vertebral Fractures**: In Probe Audits conducted in 2009, 2010, and 2011, Kaiser identified problems with claims submitted for HCC 157, Vertebral Fractures without Spinal Cord Injury.  This is another diagnosis where Kaiser found that it often submitted false risk adjustment claims to CMS because physicians improperly coded the condition as active when, in fact, the patient only had a "history of" the condition.

126.    **Vascular Disease**:  In Probe Audits conducted in 2007 (from the "2006 Wrap-up Report"), 2009, 2010, 2011, 2012, and 2013, Kaiser identified problems with claims submitted for HCCs 104, Vascular Disease with Complications, and/or 105, Vascular Disease.

127.    The audit documents and additional research by Kaiser identified at least two causes for these errors.  First, some claims erroneously claimed the patient had current vascular disease, when, in fact, they had only a history of the condition.

128.    This was particularly true for cases where the patient had a history of pulmonary embolism, a condition when one or more pulmonary arteries in the patient's lungs become blocked.  In most cases, pulmonary embolism is caused by blood clots that travel to the lungs from the legs.  Patients who have one or more pulmonary emboli are often treated with anti-coagulants to prevent the development of additional emboli.  Until a recent rule change, it was improper to classify patients being treated with anti-coagulants to prevent emboli as being treated for pulmonary embolism; they were properly coded as having only a history of pulmonary embolism.  Kaiser knew that physicians routinely misapplied this rule, coding patients on anti-coagulants as having pulmonary embolism, thus causing the submission of false claims for HCC 104.

129.    Second, certain claims were false because of a "mismapping" problem with HealthConnect, Kaiser's EMR.  HealthConnect, used throughout all of its regions, allows physicians to choose a descriptive diagnosis (as opposed to a specific ICD-9 code) when entering clinical information.  HealthConnect then "maps" this descriptive diagnosis to a specific ICD-9 diagnosis code, which is then inserted into the medical record documentation.  For certain diagnoses, however, this "diagnosis" file in the past has linked a descriptive term to the wrong ICD-9 diagnosis code.

130.    For example, pain in the legs associated with physical activity may be a result of a lack of blood supply to the legs (vascular claudication) or nerve root compression (neurogenic claudication).  Relator discovered that when a physician attempted to diagnose a patient with the neurologic condition, it incorrectly mapped to the ICD-9 code for the vascular disorder.  For this reason, false claims were submitted for a vascular condition (HCC 104 or 105) when the physician attempted to diagnose a patient with nerve compression (a condition that does not risk adjust).

131.    **Chronic Bronchitis**: In Probe Audits conducted in 2007 (the "2006 Wrap-up Report"), 2009, 2011, 2012, and 2013, Kaiser identified problems with claims submitted for HCC 108, Chronic Obstructive Pulmonary Disease ("COPD").

132.    The probe audits regularly found COPD claims erroneous based on lack of documentation in the record, or because the doctor failed to document the patient's condition with sufficient specificity to determine if the patient actually had COPD.

133.    In addition, Kaiser's problematic diagnosis file also affected claims for HCC 108. Because of mismapping, when a physician attempted to diagnose a patient with bronchitis (a diagnosis that does not risk adjust), it was incorrectly mapped to an ICD-9 code for chronic bronchitis, and thus classified as HCC 108 (which does risk adjust).  The 2010 Probe Audit specifically flagged this problem, even though it did not affect any risk adjustment claims audited that year.

134.    Kaiser's EMR also pressured physicians to use the diagnosis code for chronic bronchitis (which risk adjusts) rather than acute bronchitis (which does not risk adjust).  If a physician chose acute bronchitis as a diagnosis, HealthConnect (Kaiser's EMR) warned them that this could affect their score on certain quality measures.  HealthConnect also informed them

that if they selected simple bronchitis or chronic bronchitis instead, the quality measure at issue would not be negatively affected.

135.     **Metastatic Cancer**: In Probe Audits conducted in 2009, 2010, 2011, and 2012. Kaiser identified problems with claims submitted for  HCC-7, Metastatic Cancer and Acute Leukemia.

136.     While some of these errors were caused by improper use of codes for active cancer, when the patient actually had a "history of" cancer, there was at least one other cause. Again, errors in Kaiser's diagnosis file led to the insertion of an incorrect diagnosis code in the file, indicating metastasis in circumstances where the physician selected a non-metastatic descriptive diagnosis.  Metastatic cancer is a condition where cancer spreads from one organ to another and results in significant additional risk adjustment payments.

137.     **Myocardial Infarction and Old Myocardial Infarction**: In Probe Audits conducted in 2006 (2007 audit of 2005 data), 2010, and 2011, Kaiser identified problems with claims submitted for HCCs 81, Acute Myocardial Infarction ("MI"), and/or 83, Angina Pectoris/Old Myocardial Infarction ("old MI").

138.     An MI is a heart attack.  Kaiser's Probe Audits identified multiple issues with the claims submitted for HCCs 81 and 83.  In some cases, a claim was submitted for an acute MI, when the proper claims should have been for old MI.  In other cases, the only support for an old MI diagnosis was a radiology report or other test result, rather than a diagnosis documented by an appropriate provider in a face-to-face visit.  In other cases, Kaiser simply concluded that the medical record documentation did not support the diagnosis of an MI or old MI at all.

139.     **Malnutrition**: In Probe Audits conducted in 2009 and 2011, Kaiser identified problems with claims submitted for HCC 21, Protein-Calorie Malnutrition.

140.    Kaiser identified several causes for these problems.  In some cases, the condition was diagnosed as current when the patient actually only had a "history of" the condition.

141.    In other cases, the false claim resulted from Kaiser coders and/or computer systems adding a malnutrition diagnosis where the treating physician had not.  This often happened when a physician used the term "cachexia" in his or her treatment note.  Cachexia can be used as a specific diagnosis, indicating that patient has chronic malnutrition or a specific wasting disease.  Alternatively, physicians sometimes use variations of the term cachexia as an adjective to indicate that a patient appears malnourished, even where the patient has not been diagnosed with the disease cachexia (*e.g.*, the patient "looks cachetic").  In the latter case, it is inappropriate for a coder to decide that a patient has cachexia, because only a physician (or other appropriate provider) can determine that a patient has a given condition.

142.    **Decubitus Ulcers**: In Probe Audits conducted in 2009 and 2011, Kaiser identified problems with claims submitted for HCC 148, Decubitus Ulcer of Skin.

143.    There are two primary ulcer types: (1) decubitus ulcers, due to pressure; and (2) venous stasis ulcers, where the skin breaks down because of prolonged swelling in the extremities due to poor circulation.  When properly coded, decubitus ulcers support a risk adjustment claim for HCC 148; venous stasis ulcers do not risk adjust.  One reason Kaiser was submitting false claims for HCC 148 is that physician documentation often failed to sufficiently identify the cause of a patient's ulcer.  For example, the audit notes for the 2011 Probe Audit report that one claim was found to be false because "record supported skin breakdown due to maceration rather than an ulcer due to pressure."

144.    Decubitus ulcers were also improperly claimed when no ulcer was present.  For example, another claim from the 2011 Probe Audit invalidated a diagnosis of decubitus ulcer

noting that "NCO [Kaiser's National Compliance Office] could find no documentation to support that the patient [had] an ulcer.  The physician documented that the SNF nursing staff reported no skin problems."

145.   **Sick Sinus Syndrome**: In Probe Audits conducted in 2006 (2007 audit of 2005 data), 2009, 2010, 2011, 2012, and 2013, Kaiser identified problems with claims submitted for HCC 92, Specified Heart Arrhythmias.

146.   Sick sinus syndrome ("SSS") is the name for a group of heart rhythm problems (arrhythmias) in which the sinus node – the heart's natural pacemaker – does not work properly. A person with SSS may have heart rhythms that are too fast, too slow, punctuated by long pauses, or a combination of these rhythm problems.  SSS is often treated with the implantation of a pacemaker.

147.   Under established coding guidelines, once a patient has received a pacemaker to treat her SSS, it is no longer appropriate to code her condition as acute SSS (assuming the pacemaker is effectively treating the SSS).  Instead, her condition should be coded to reflect the presence of the pacemaker.

148.   One reason for the number of false claims submitted for HCC 92 is that, as Kaiser knows, physicians routinely submit a diagnosis code for SSS when they only should be submitting the code for the presence of the pacemaker.  As Kaiser noted in one record for the 2011 Probe Audit: "The record documents that the patient is on a pacemaker for SSS, and per Coding Clinic guidelines in the situation the SSS may only be coded if … the SSS is addressed or there is a problem with the pacemaker."

149.   Kaiser could easily prevent the submission of false claims for Sick Sinus Syndrome by setting up a process in its claims and billing software to flag situations where a

claim includes a diagnosis of SSS and the presence of a pacemaker, and delete the diagnosis for

SSS.  It is notable that Kaiser has chosen not to use such a claims processing rule to fix this

problem because Kaiser uses such rules to add new diagnoses if such a change will allow Kaiser

to submit additional risk adjustment claims to CMS.  For example, in cases where a patient is

being treated with a type of drug that typically indicates major depression (a diagnosis that risk

adjusts) but the patient has only been diagnosed with standard depression (a diagnosis that does

not risk adjust), these claims are flagged for review to potentially code major depression.

150.    In a similar way, Kaiser could easily conduct a retrospective audit of previously

submitted claims based on a diagnosis of SSS by selecting any such claims that also had a

diagnosis code for presence of a pacemaker.  Nonetheless, Kaiser has not done so.

151.    **Renal Insufficiency**: In Probe Audits conducted in 2009, 2011, and 2013, Kaiser

identified problems with claims submitted for HCC 131, Renal Failure.

152.    Chronic kidney disease ("CKD") is a condition that is often miscoded, and can

have significant impact on risk adjustment scores.  Although CKD is classified as Levels I to V,

depending on the seriousness of the disease, all five levels of CKD map to the same HCC --

HCC 131.

153.    Kaiser knew that patients were often incorrectly diagnosed with low level CKD

(Levels I and II), but failed to conduct any targeted audits to test these claims.  Such audits

would have been particularly straightforward because the diagnosis of CKD Levels I and II is

largely driven by two lab test values: (a) the patient's glomerular filtration rate ("GFR") rate; and

(b) the presence of protein in the patient's urine.

c.     **False Claims Submitted Due To Other Coding Violations**

154.     The Colorado and national Probe Audits also identified consistent problems with the application of basic risk adjustment coding rules.  Because these errors were process-based rather than diagnosis specific, it would be more difficult to perform a targeted audit to identify the affected false claims.  Notably, though, Kaiser did conduct broad audits to find claims affected by similar process-based issues, as long as those problems led to increased revenue to Kaiser when fixed.  Moreover, these process-oriented problems could have been addressed relatively easily using Kaiser's Natural Language Process program (discussed in greater detail below), if Kaiser had chosen to do so.

155.     In its Probe Audits, Kaiser found that false claims were routinely submitted to CMS where the diagnosis was listed in medical documentation of a physician or hospital outpatient visit as probable, rule out, or suspected.  As discussed above, CMS rules prohibit the use of such a diagnosis for a risk adjustment claim.

156.     For example, in the 2011 Colorado Probe Audit, a stroke HCC was deemed invalid because the suspected stroke had been "ruled out by time of discharge but coded as if present."  Another claim, for a diagnosis of vascular disease (based on a reported pulmonary embolism), was invalidated because the record specifically stated "P[ulmonary] E[mbolism] ruled out."

157.     Again, in the 2013 Colorado Probe Audit, the audit identified a claim submitted for deep vein thrombosis (DVT) where the diagnosis had been "ruled out by work-up."

158.     The Probe Audits also found that Kaiser routinely submitted claims where a non-chronic diagnosis was listed on a problem list or elsewhere in the medical record without any

notation or other evidence that the diagnosis was treated or affected the treatment provided. CMS rules prohibit the submission of claims based on such diagnoses.

159.    For example, in the 2010 Probe Audit, 7% of all errors were based on a submitted diagnosis for a non-systemic condition where there "was no documentation to support that the condition had been addressed, evaluated, treated, or considered."

160.    The Probe Audits also found that Kaiser routinely submitted claims where the only documentation to support the diagnosis was a radiologic or lab test, or other non-face-to-face service.  CMS rules prohibit the submission of claims based on such diagnoses.

161.    For example, in the 2010 Probe Audit, two of the invalidated HCCs were found to be invalid because they were based on diagnostic radiology reports.

### d.    Diagnoses Kaiser Identified as Upcoded Through High Risk Filter

162.    From approximately 2010 through late 2011 or early 2012, Kaiser's Colorado region used a "filter" program to review certain "high risk" (*i.e.*, often overcoded) diagnoses submitted by internal providers before those diagnoses were submitted to CMS for risk adjustment payments.  The filter tagged specified diagnoses for manual review by one of Kaiser Colorado's five coders, every time one of the "high risk" diagnoses was received from a CPMG physician.  If the Kaiser coders determined that the diagnosis was invalid, it would be flagged to prevent Kaiser from submitting a risk adjustment claim to CMS on the basis of that diagnosis.

163.    The filter was relatively successful in reducing the error rate for some of the diagnoses and internal provider groups it covered.  However, for many of the diagnoses, the filter showed that Kaiser continued to have a high error rate.

164.    The audits conducted in connection with the filter identified not only specific HCCs that had high error rates, but also the individual diagnosis codes that were problematic.

165.     For example, as of July 2011, the filter program reviewed the following HCCs
and found the following error rates:

| HCC | Description | HCCs Reviewed | Invalid HCCs | Error Rate |
|---|---|---|---|---|
| 8 | Lung, Upper Digestive Tract, & Othr Severe Cancers | 472 | 67 | 14% |
| 9 | Lymph, Head & Neck, Brain, & Othr Major Cancers | 364 | 45 | 12% |
| 10 | Breast, Prostate, Colorect & Othr Cancers & Tumors | 3,013 | 509 | 17% |
| 32 | Pancreatic Disease | 361 | 51 | 14% |
| 44 | Severe Hematological Disorders | 5 | 5 | 100% |
| 92 | Specified Heart Arrhythmias | 7,113 | 1,084 | 15% |
| 96 | Ischemic or Unspecified Stroke | 460 | 215 | 47% |
| 104 | Vascular Disease with Complications | 582 | 172 | 30% |
| 157 | Vertebral Fractures without Spinal Cord Injury | 320 | 115 | 36% |
| 158 | Hip Fracture/Dislocation | 530 | 153 | 29% |
| 164 | Major Complications of Medical Care and Trauma | 52 | 19 | 37% |

166.     Much to Relator's frustration, though, the filter did not address the category of
claims with the highest error rate -- external providers.  Nor did Kaiser conduct audits of claims
submitted for these "high risk" diagnoses for internal providers in prior years.

167.     Further, although Kaiser blocked erroneous diagnoses identified through the filter
from being submitted as risk adjustment claims in the year at issue, Kaiser did not correct the
problem lists in the EMRs.  Because most diagnoses listed on a patient's problem list tend to be
included in subsequent claims, by failing to correct the patients' problem lists, there was a high
likelihood that the same diagnoses would be submitted to CMS in subsequent years.

168.     Even worse, in late 2011 or early 2012, Kaiser Colorado ended the "high risk" filter program itself, even though the audits conducted pursuant to the program continued to show high error rates in the coding for these "high risk" diagnoses.  No similar program was adopted to replace the filter program.

**2.      Kaiser Re-Submits Claims, or Refuses To Delete Claims, for Diagnoses That It Knows Are Invalid**

169.     In the limited instances where Kaiser conducts a broad retrospective audit to identify previously submitted false claims, it does not always delete those claims or otherwise repay Medicare.  For example, as discussed above, during the 2010 stroke pilot project, Kaiser Colorado identified at least $3.1 million in false claims for HCC 96 (Ischemic or Unspecified Stroke).  However, Kaiser did not delete those codes, or otherwise repay Medicare for the overpayment it received as a result of these false claims.

170.     Further, in the instances where Kaiser does delete previously submitted false codes, it often later re-submits those same claims, thus seeking (and receiving) payment for the diagnoses that it knows to be false.

171.     Kaiser Colorado and Kaiser Hawaii do this because of a problem in their claims processing systems.  When codes are deleted after an audit, the system for Colorado and Hawaii does not have a flag or other mechanism to indicate that the audit found these diagnoses to be invalid.  Nor are the diagnoses removed from the patient's medical record.  Thus, when Kaiser conducts "resweeps" – a process designed to re-examine the EMR system to capture diagnoses that were added to patients' medical records after the initial submission of data to Kaiser's risk adjustment claims system – the system picks up the previously deleted diagnoses.  Thereafter, Kaiser submits new risk adjustment claims for these diagnoses that Kaiser already determined to

be invalid.  Kaiser is aware that the flaw in Colorado and Hawaii's claims processing systems has this effect.

> **3.** **Kaiser Acts With Reckless Disregard and/or Deliberate Ignorance As to the Falsity of a Substantial Number of the Risk Adjustment Claims It Submits**

172.    In addition to the false risk adjustment claims that Kaiser submits (or re-submits) with actual knowledge of their falsity, Kaiser also submits a substantial number of claims that Kaiser knows are false, within the meaning of the False Claims Act, because Kaiser acts with reckless disregard and/or deliberate ignorance as to their truth or falsity.

173.    Kaiser is on notice that certain categories of its risk adjustment claims (*e.g.*, as described above, external providers, certain diagnoses) are false a significant percentage of the time.  Nonetheless, Kaiser routinely fails to take reasonable steps to identify which of these claims are false, and then to prevent their submission in the first place or to delete them after submission.

174.    Despite the fact that Kaiser's Probe and other audits have consistently identified areas where a significant number of the claims Kaiser submits are false, Kaiser's reaction, on a national and regional level, has been to (except in isolated instances) avoid conducting retrospective audits to correct previously submitted false data.

175.    Instead, Kaiser's response to these audits focuses primarily on provider coding education that would, at best, only affect future claims.  Kaiser's corrective action plans routinely prescribe only the deletion of those specific claims found to be false and some measure of future education.  Even worse, in the few instances where a CAP does call for follow up audits, in Relator's experience, these audits are typically not done.

176.    Because these Probe Audits routinely identify specific types of claims (either by diagnosis, by provider type, or by other category), in most cases Kaiser could easily do a targeted audit to find erroneous claims in a relatively cost efficient manner.  Kaiser refuses to do so.

177.    In contrast, Kaiser's response is very different when it learns certain diagnoses are undercoded.  Kaiser regularly invests substantial resources in audits to find potential undercoded conditions.  Moreover, when Kaiser finds undercoded conditions, it always (or almost always) submits risk adjustment codes for those conditions.  For overcoded conditions, on the other hand, Kaiser rarely conducts follow up audits of all claims for that diagnosis submitted in that year, or prior years.  Furthermore, in some instances (as with the stroke project discussed above) even where errors are found, Kaiser does not delete the previously submitted erroneous codes.

178.    For example, in 2006, Kaiser's Colorado region conducted "Reimbursement Recovery Audits" ("RRA") looking for new diagnosis codes to submit for at least 19 different clinical pathways or diagnoses.  None of these audits targeted overcoded claims, even though Kaiser knew that some of the same conditions (*e.g.*, MI) were often overcoded.  In 2007, Kaiser Colorado conducted at least 22 such targeted clinical audits.

179.    In 2010, Kaiser's Colorado region conducted more than 30 such RRA audits to find new claims.  Again, several of the audits targeted diagnoses that Kaiser knew were also routinely overcoded (*e.g.*, breast cancer, prostate cancer, arrhythmia, chronic kidney disease, COPD, MI), yet these audits only looked for new diagnoses to submit, which has the effect of increasing Kaiser's risk adjustment payments from CMS.

180.    Relator has learned, through RRG meetings and conversations with other Kaiser employees, that Kaiser's other regions similarly conduct a substantial number of targeted clinical audits designed to find undercoded conditions and thereby increase their Medicare

reimbursement.  These audits often cover all, or substantially all, patient charts for a given year that meet certain clinical criteria that suggest a possibility of undercoding.  Yet these regions conduct few, if any, similar audits to find overcoding, in which Medicare overpayments would need to be returned.

181.    At a September 16, 2008 RRG meeting, Dr. Robert Klein presented the results of Kaiser's Northern California Region's 2008 targeted clinical audits for undercoded claims.  The region audited at least 12 different clinical pathways.  As with the Colorado region's RRA audits, several of these audits targeted the same diagnoses (*e.g.*, MI, Chronic Kidney Disease) that Kaiser knew were often overcoded as well.  No audits were performed to find overcoded claims for these diagnoses.  Moreover, Dr. Klein proposed the addition of further retrospective reviews designed to find examples where, *inter alia*, metastatic cancer (HCCs 7 and 10), is undercoded.  No similar proposal was made to find examples of overcoded cancer, even though Kaiser knows this is one of the top diagnoses that is overcoded and improperly submitted.

182.    Interestingly, in 2010, Kaiser's Northern California Region did take some steps to attempt to remedy overcoded conditions.  It audited data in its claims systems for care provided to patients in 2009.  This audit appears to have been conducted before these diagnoses were used to submit risk adjustment claims.  When the audit found incorrect diagnoses, Kaiser blocked them so that they would not be used as the basis for future risk adjustment claims.

183.    Of the 4,566 diagnoses audited, 1,781 (39%) "did not have supporting documentation."  Kaiser "blocked" these diagnoses so that no risk adjustment claims were submitted for them. Notably, Kaiser also found an additional 475 diagnoses that should have been included in the claims data.

184.    This is exactly the type of due diligence that Kaiser should have been performing across all regions and for all plan years to identify problems with its medical record documentation before those errors led to the submission of false claims.  Instead, however it was an anomaly.

185.    Moreover, although Kaiser Northern California identified certain diagnoses as routinely incorrectly submitted, it did not conduct an audit of claims submitted for these diagnoses in prior years.

186.    One of the most egregious examples of Kaiser's unwillingness to give the search for false claims the same attention as the search for new diagnoses to submit is Kaiser's program designed to "refresh" chronic diagnosis that are submitted one year but not the next.  In this process, Kaiser routinely discovers certain patients for whom risk adjustment claims for specific diagnoses submitted in prior years were likely false.  Nonetheless, Kaiser refuses to conduct any investigation of those prior year claims.

187.    For example, in 2009, Dr. Karl Pregitzer, Associate Medical Director for Physician Business Services at Hawaii Permanente Medical Group, conducted a "diagnosis refresh" audit.  He reviewed diagnoses submitted for a patient one year and not the next, where the physician had also removed the diagnosis from the patient's problem list.  Dr. Pregitzer queried the treating physicians to determine whether the diagnosis was correctly omitted in the second year.  He classified the results into three categories: (1) captured, meaning the diagnosis was incorrectly omitted in the second year; (2) inactivated, meaning the diagnosis was properly omitted in the second year; and (3) pending, meaning it was still unclear whether the diagnosis was properly omitted.

188.    In an April 2, 2009 PowerPoint outlining his findings, Dr. Pregitzer raised a concern that the same five diagnoses had the highest number of claims in each of these three categories: (a) HCC 15, Diabetes with Renal or Peripheral Circulatory Manifestation; (b) HCC 16, Diabetes with Neurologic or Other Specified Manifestation; (c) HCC 80, Congestive Heart Failure; (d) HCC 105, Vascular Disease; and (e) HCC 131, Renal Failure. The specific conditions he identified that were causing the problems were all ones that generally do not go away once a patient has them.  Thus, Dr. Pregitzer noted that it was unusual to see these conditions showing up in one year, but then a physician determining that they did not exist the following year.  His recommendation was that these five diagnoses warranted further data mining, because the results suggested that there was substantial physician confusion about the proper coding rules for these diagnoses.

189.    With respect to the second category, inactivated claims, Dr. Pregitzer's findings strongly suggest that the earlier diagnosis was incorrect.  Thus, these audit results strongly suggested that for at least one (and likely more) prior years Kaiser had submitted: (a) 104 false claims for HCC 15; (b) 123 false claims for HCC 16; (c) 99 false claims for HCC 80; (d) 205 false claims for HCC 105; and (e) 213 false claims for HCC 131.  Nonetheless, Kaiser did not audit the prior years' claims for these patients to determine whether they were accurate.

190.    Another area where Kaiser was on clear notice that specific claims were false was with respect to the problems with its diagnosis files.  As described above, Kaiser discovered on several occasions that certain diagnoses described in its EMR were incorrectly mapped to ICD-9 diagnosis codes that were eligible for risk adjustment payments.  In 2011 Kaiser audited the diagnosis file and found that a substantial number of diagnoses were incorrectly mapped. Relator does not know whether Kaiser fixed these mapping errors.  Even worse, to Relator's

knowledge, Kaiser failed to conduct an audit of previously submitted claims affected by these errors, even though it knew that certain errors caused the submission of identifiable risk adjustment claims.

### 4. Problems with Kaiser's Natural Language Processing Audit Program Caused the Submission of False Claims

191.    Beginning in approximately 2009, Kaiser developed a Natural Language Processing ("NLP") audit program to try to find new diagnosis codes to submit.  Broadly speaking, the NLP program uses an algorithm to search EMRs to find words that, individually or in combination, indicate that a patient has certain diagnoses.  If done properly, NLP analysis can be an effective tool to find diagnoses that were properly documented in the physician treatment notes but not submitted in the claims data.

192.    For that matter, a good NLP program can also identify situations where a diagnosis was submitted with the claims data but is not documented in the medical record. Several existing NLP programs on the market provide such functionality.  They have a user interface that would permit the user to view all previously reported diagnoses as well as ones added by the software and confirmed by the coders.  Further, clicking on any diagnosis would take the reviewer to the corresponding portion of the note.

193.    In fact, Kaiser uses such programs (sold by 3M and OptumInsight) to conduct NLP analysis of its hospital radiology and Emergency Department claims for health plans other than its Medicare Advantage plans, *e.g.*, its commercial plans.

194.    Some of the problems identified in Kaiser's Probe Audits that, as discussed above, are not necessarily easy to target in a diagnosis-specific audit (*e.g.*, non-chronic conditions that were listed in the record without documentation of treatment; use of radiological

test results as the basis for a claim; coding diagnoses that were listed as possible, probable or rule-out) could readily be targeted through a NLP audit and later corrected/deleted.

195.    Rather than use an established NLP program, Kaiser built its own – even though Kaiser uses established NLP products from 3M and OptumInsight for other purposes.  Notably, Kaiser's NLP program was built without any function to allow it to audit the validity of previously submitted claims.

196.    All face-to-face visits to a physician or hospital by members of Kaiser's MA plans are run through the NLP software to identify new diagnoses that might be appropriate to use for the submission of additional risk adjustment claims.  The results are grouped into four categories: (a) True Positive: diagnoses that have been confirmed by two Kaiser coders; (b) More Information Needed: diagnoses that may be present, but further analysis is required to confirm; (c) Problem List Only: diagnoses that show up only on the member's problem list with no documentation of treatment; and (d) False Positives or Found Elsewhere.

197.    Kaiser allows the various regions to decide how to use this information.  For example, a PowerPoint presented at the Fall 2010 RRG Meeting outlined the results of the "NLP HCC Data Mining Pilot."  Three regions had participated in the pilot: (a) Georgia; (b) Hawaii; and (c) Northwest.  The Northwest region appears to have simply passed along all of its "True Positive" diagnoses to its risk adjustment claims submission system (which submits the claims to CMS) without further review.  The Georgia region passed along most (278 of 294) of the diagnoses to its risk adjustment claims submission system, which submits the claims to CMS.  It is unclear from the presentation why some diagnoses were not passed along.

198.    The Hawaii region, on the other hand, audited all of the "True Positives" before passing them on.  Remarkably it found a 29% error rate in these claims that had supposedly been

confirmed by two Kaiser coders.  It now continues to audit all "True Positives."  Relator spoke

with Terri Keliinoi, Kaiser Hawaii's manager of risk coding, on October 14, 2014.  The manager

reported that as of the review of the 2014 file, they are still finding a 20% error rate in the "True

Positives."

199.    This is consistent with Relator's own experience.  He personally reviewed over

100 of the supposedly "True Positive" claims for the Colorado Region and found a 10% error

rate.  In particular, he noted that it appears that the NLP software picks up, and the reviewing

coders have validated, diagnoses that appear in problem lists but which lack additional notation

of treatment.  As described above, a diagnosis may not be submitted for risk adjustment purposes

if it just appears in a problem list.  There must be further indication that the physician considered

or treated the diagnosis.

200.    Notwithstanding this high error rate, Kaiser continues to allow its regions to

determine whether they will conduct any additional review of the True Positives before

submission to CMS.  The Colorado region passes the True Positive diagnoses to its claims

submission system with no further review, even though Kaiser knows that many of these claims

are likely false.  Likewise, the Northwest region passes through all True Positive diagnoses with

the exception of diagnoses of cachexia (which are known to have very high error rates).  The

Hawaii region, on the other hand, has both a coder and a physician audit 100% of the "True

Positives."

201.    By failing to take corrective action to prevent the submission of false diagnosis

data, knowing that in the absence of action such data would be submitted, Kaiser knowingly

submitted false claims to CMS for risk adjustment payments.

## COUNT I

### Federal False Claims Act
### 31 U.S.C. §§ 3729(a)(1)(A)–(B), (G)

202.    Relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 201 of this Complaint.

203.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, as amended.

204.    By virtue of the acts described above, Defendants, their agents, and employees, knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval.

205.    By virtue of the acts described above, Defendants, their agents, and employees, knowingly made or used, or caused to be made or used, false or fraudulent records or statements material to false or fraudulent claims.

206.    By virtue of the acts described above, Defendants, their agents, and employees, knowingly concealed overpayments from the United States Government and failed to remit such overpayments.

207.    The Government, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

208.    By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

209.    Additionally, the United States is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein.

## PRAYER

WHEREFORE, *Qui Tam* Plaintiff-Relator Dr. James M. Taylor prays for judgment against Defendants as follows:

1.      That Defendants cease and desist from violating 31 U.S.C. §§ 3729 *et seq*.

2.      That the Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained as a result of Defendants' actions in violation of the Federal False Claims Act, as well as a civil penalty of $11,000 for each violation of 31 U.S.C. § 3729;

3.      That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the Federal False Claims Act;

4.      That Relator be awarded all costs of this action, including attorneys' fees and expenses; and

5.       That the United States and Relator receive all such other relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands trial by jury.


DATED: October 22, 2014                    Respectfully submitted,

                                           By:  /s/ Daniel M. Twetten

                                           Daniel M. Twetten
                                           dan@loevy.com
                                           LOEVY & LOEVY

2060 Broadway, Suite 460
Boulder, CO 80302
Tel: (720) 583-6514
Colorado Bar Number: 44134

Timothy P. McCormack
tmccormack@phillipsandcohen.com
Molly B. Knobler
mknobler@phillipsandcohen.com
PHILLIPS & COHEN LLP
2000 Massachusetts Ave, NW
Washington, DC 20002
Tel: (202) 833-4567

Mary A. Inman
minman@pcsf.com
PHILLIPS & COHEN LLP
100 The Embarcadero, Suite 300
San Francisco, CA 94105
Tel: (415) 836-9000


Attorneys For *Qui Tam* Plaintiff-Relator Dr. James
M. Taylor, M.D.